UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

JULIE ANN RODRIGUEZ,

                                                Plaintiff,           **CORRECTED DECISION AND ORDER**

                 -against-                              19 Civ. 4351 (PED)

COMMISSIONER OF SOCIAL SECURITY,

                                      Defendant.

-------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.:**

I.     **INTRODUCTION**

       Plaintiff Julie Ann Rodriguez ("Plaintiff" or "Claimant") brings this action pursuant to 42

U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Defendant"

or the "Commissioner") denying her application for disability insurance benefits and

supplemental security income.  This case is before me for all purposes on the consent of the

parties, pursuant to 28 U.S.C. § 636(c). Dkt. 21.  Presently before this Court are the parties'

cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, Dkts. 18 (Plaintiff's motion), 19 (Plaintiff's memorandum of law), 23 (Defendant's

cross-motion), and 24 (Defendant's memorandum of law).  For the reasons set forth below,

Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

II.    **BACKGROUND**

       The following facts are taken from the administrative record ("R.") of the Social Security

Administration. Dkt. 17.

**A.  Application History**

Plaintiff filed for disability insurance benefits and supplemental security income on June

29, 2015 and September 8, 2015, respectively, alleging that she had been disabled since November 23, 2014. R. 289-97.  Her claims were administratively denied on or about September 25, 2015. R. 127-52.  On or about November 6, 2015, Plaintiff requested a hearing before an administrative law judge ("ALJ"). R. 161-62.  A video hearing was held on June 11, 2018 before ALJ Kieren McCormack. R. 74-126.  Plaintiff appeared with counsel and testified at the hearing. *Id.*  On July 3, 2018, ALJ McCormack issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act ("SSA"). R. 13-32.  On November 26, 2018, the Appeals Council denied Plaintiff's request for review, R. 1-7, and the ALJ's decision became the Commissioner's final decision.  On May 3, 2019, Plaintiff filed the instant complaint. Dkt. 2.

### B.  Plaintiff's Medical History

The Court conducted a plenary review of the entire administrative record, Dkt. 17, familiarity with which is presumed.  Thus, I assume knowledge of the facts surrounding plaintiff's medical treatment and do not recite them in detail, except as necessary in the context of the analysis set forth below.

### C.  Hearing Testimony

On June 11, 2018, Plaintiff, in Poughkeepsie, New York, appeared with counsel via video before ALJ McCormack in White Plains, New York. R. 74-126.[1]  Plaintiff's counsel first acknowledged that the medical record was complete and, after Plaintiff was sworn in, the ALJ began questioning her concerning her work history. R. 83, 87-93.  Plaintiff testified that in 2005 and 2006, she cared for children in a residential facility.  The vocational expert ("VE") described

---

[1] A hearing was first held on June 5, 2017; however, it was adjourned to allow Plaintiff the opportunity to obtain counsel. R. 60-73.

this job as a resident aide, semi-skilled with medium exertional level.  Plaintiff next testified that

from 2008 to 2010, she was a home health aide, which the VE also described as a home health

aide, semi-skilled with a medium exertional level.

The ALJ next questioned Plaintiff about her medical ailments. R. 93.  Plaintiff testified

that she was receiving injections for her lumbar spine issues, including a herniated disc, but the

pain remained unbearable.  Plaintiff elaborated that she had trouble playing with her daughters

and had trouble doing "anything," for example, people had to accompany her to shop for food, to

assist her with laundry and household chores, and she had difficulty sleeping. R. 94-95.  As to

ailments in her hips, Plaintiff asserted that she had arthritis, bursitis, tendinitis, tears, and fluids.

Plaintiff testified that she last received an injection in March 2018 and was no longer receiving

them; however, she added that this was due to her doctor informing her that she could only have

one such shot a year because her body was unable to handle a larger amount of steroids. R. 96.

Plaintiff further attested that she could not bend over, but she could ambulate with pain. R. 97-

98.

Plaintiff also discussed her mental health ailments, claiming that the last time she took

psychiatric medications was around 2013 when she was taking Zoloft. R. 98.  She also testified

that her anxiety and PTSD affected her ability to relate to others and to focus on simple tasks. R.

98-99.

The ALJ next asked Plaintiff to describe a typical day in her life. R. 100-04.  Plaintiff

testified that she would typically wake up around 4:00 a.m., or 3:00 a.m. if she could not sleep.

After her youngest daughter had woken, Plaintiff would assist her with preparing breakfast,

usually toast.  Her older daughter was able to pour herself cereal, and Plaintiff would remind her

to take her medications.  Both of Plaintiff's daughters were able to dress themselves.  Plaintiff

would next drive her daughters up the street where her oldest daughter would catch a bus and her younger daughter would be dropped off at elementary school—an aide would come to the car to walk her daughter inside.  Plaintiff would then return home where she would either ice or heat her hips or knee, whichever was worse on that particular day, make calls to schedule medical appointments for herself and her daughters, call her mother, and then "do nothing . . . and . . . spend the day just sad . . . and feeling bad about [her]self."  Later in the day, Plaintiff would pick up her younger daughter from school and proceed to her mother's house where her older daughter would be waiting. They would all stay at Plaintiff's mother's home where Plaintiff's mother  could "pick up the slack."  Additionally, Plaintiff stated that she would dictate chores to her daughters and that she needed the assistance of neighbors to take out the garbage.

On direct exam, R. 104-18, Plaintiff's counsel elicited from Plaintiff that she had "fairly recently," in 2013, developed a problem with her left knee which would cause her to fall. Plaintiff testified that Dr. Suzanne Brown referred her to Dr. Stuart Styles who took an MRI of her knee and found a torn ACL.  Plaintiff attested that she was not using a cane but would lose her balance once a week.  She was also told by her doctors that she did not yet require spinal surgery.  Plaintiff averred that her trouble sleeping was related to her hip pain and that she had trouble eating, at one point dropping from a weight of 100 lbs. to 80 lbs., because the pain made her nauseous.  As to her psychiatric care, Plaintiff explained that her Zoloft prescription was not helping and that her anxiety worsened when she was abused.  Additionally, Plaintiff testified that she could not afford to see a psychiatrist.  When Plaintiff was in court for issues related to domestic violence, she was seeing an advocate appointed by the court; however, after her ex-partner was killed, the case ended and she had to stop seeing the advocate.

The ALJ next presented the VE with a series of hypotheticals based on which the VE testified whether jobs would exist in the national economy for the respective hypothetical individuals.  The ALJ first asked the VE to assume an individual who was 41 to 44 years old, 41 at onset, with past relevant work that was semi-skilled with a medium exertional level, and who could perform sedentary work.  The individual could also climb, balance, bend, kneel, crouch, and crawl on an occasional basis. R. 119.  The VE determined that this individual could not perform past relevant work, but the following jobs existed in the national economy: (1) addressor (DOT code 209.587-010, sedentary, and with 67,230 employed in the economy); (2) call-out operator (DOT code 237.367-014, sedentary, and with 37,680 employed); and (3) telephone quotation clerk (DOT code 237.367-046, sedentary, and with 997,770 employed). R. 119-20.

The second hypothetical was the same as the first but the individual could work in low-stress jobs, defined as jobs containing more than simple, routine, repetitive tasks involving only simple, work-related decisions with few, if any, workplace changes, where there is only occasional interaction with supervisors, coworkers, and/or the general public. R. 120.  The VE determined that (1) the job of addressor would still be viable, plus (2) document preparer, microfilming (DOT code 249.587-018, sedentary, and with 2,955,550 employed), and (3) stuffer (DOT code 731.685-014, sedentary, and with 386,520 employed). R. 120.

The third hypothetical consisted of either the first or the second hypothetical but with this limitation added: could only work at jobs allowing the individual to be off task by at least 15% of the day during the course of an eight-hour workday. R. 121.  The VE concluded that there would be no employment available to this individual. Id.

Plaintiff's counsel then questioned the VE and asked the VE to consider that the above individual was off task 10 or more percent of the time.  The VE explained that job erosion begins

5

at 8% and 15% is the maximum, therefore, approximately just over half of the jobs would remain available.  Plaintiff's counsel then asked the VE to consider that the person was absent from work at least one day a month.  The VE answered that the maximum allowed absences is one day per month, and anything above that would rule out employment. R. 123.  Plaintiff's counsel then asked if these jobs would have probationary periods, and the VE responded that they typically would have such a period of 30 to 60 days, and one unexcused absence would typically be the maximum allowed. R. 123-24.

## III.    THE ALJ'S DECISION

The ALJ issued his decision on July 3, 2018 following the standard five-step inquiry used for determining disability. R. 13-26.  In the first step of the inquiry, the ALJ determined that Plaintiff had not performed substantial gainful activity since November 23, 2014, the alleged onset date. R. 18.

At step two, the ALJ found that several of Plaintiff's medical issues— muscle spasms of the back, labrum tear and bursitis of the right hip; joint space loss of the left hip; degenerative changes of the cervical spine; slight patellar tilt of the left knee; medial meniscus tear of the left knee; and post-traumatic stress disorder—rose to the level of "severe." R.19.  The ALJ also found that Plaintiff's diagnoses of headaches and foot contusion were non-severe impairments "based on a negative brain MRI and treatment notes that show no continuing treatment or complications." R. 19.

At step three, the ALJ decided that Plaintiff's impairments, or combination of impairments, did not meet or medically equal the "Appendix 1" impairments. R. 19.  The ALJ considered Listings 1.02, 1.04, and 12.06. R. 19-21.

The ALJ determined that Plaintiff's impairments did not meet Listing 1.02 (Major Joint Dysfunction) after reviewing 2016 x-rays of Plaintiff's left hip, showing borderline coxa valga/hip deformity with mild joint space loss but no displaced fracture or dislocation, and of Plaintiff's left knee, showing a partial tear or sprain of the ACL with medium sized joint effusion. R. 19.  The ALJ further noted that although physical exams had shown an antalgic gait, Plaintiff had 5/5 strength in the lower extremities and the ability to ambulate and drive. R. 19.

The ALJ concluded that Plaintiff did not meet Listing 1.04 (Spine Disorders) as Plaintiff was "described to use one cane, can drive, and ambulate with an antalgic gait," whereas the "regulations provide the following, non-exclusive examples of ineffective ambulation: the inability to walk without the use of a walker, two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to use standard public transportation; the inability to carry out routine ambulatory activities, such as shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." R. 20.

Listing 12.06 is met if the claimant can establish the existence of anxiety, panic, or obsessive-compulsive disorders *and* satisfy the requirements in either paragraph B *or* C, discussed *infra*.  The ALJ found that paragraph B criteria was not satisfied "[b]ecause the claimant's mental impairment does not cause at least two 'marked' limitations or one 'extreme' limitation." R. 21.  In reaching this determination, the ALJ reviewed Plaintiff's function report, *see* R. 339-60, a consultative psychiatric report completed by Dr. Ashley Dolan, Psy.D., *see* R. 511-17, and an internal medicine consultative examination completed by Dr. Rita Figueroa, M.D., *see* R. 528-35, and noted that Plaintiff had moderate limitations in understanding, remembering, or applying information. R. 20.  Based on the function report, the same psychiatric

consultative exam, and office treatment records from Dr. Kelly Marra, MD, *see* R. 462-66, the ALJ found that Plaintiff had moderate limitations in interacting with others. R. 20.  After reviewing these same records, including Plaintiff's hearing testimony, *supra*, the ALJ concluded that Plaintiff had moderate limitations in her ability to concentrate, persist, or maintain pace. R. 20.  And, finally, upon further review of these records and office treatment records from Dr. Stacy Spivack-Gross, *see* R. 481-86, the ALJ found that Plaintiff had moderate limitations in her ability to adapt or manage herself. R. 21.  The ALJ further concluded that the record failed to establish paragraph C criteria as Plaintiff had more than minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life, and that the record showed "stability of her condition, and the claimant's acknowledgement as primary caretaker for two (2) minor children with special needs." R. 21.

Between steps three and four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). R. 21-24.  The ALJ concluded that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can climb, balance, bend, stoop, kneel, crouch, and crawl on an occasional basis.  She can work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work-related decisions; with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers, and/or the general public." R. 21.  In reaching this conclusion, the ALJ considered Plaintiff's symptoms, the extent to which her symptoms were consistent with objective medical evidence and other evidence, and opinion evidence.

In assessing Plaintiff's alleged symptoms, the ALJ ultimately determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely consistent with the medical evidence and

other evidence in the record." R. 22.  The ALJ reviewed x-rays and MRIs of Plaintiff's lumbar

spine with mild findings, R. 469-70, 485, 585, 1017-18; the 2016 x-rays of Plaintiff's left hip and

left knee, discussed *supra*; 2017 MRIs of Plaintiff cervical spine showing degenerative changes

and mild anterior osteophyte formation and disc space narrowing, R. 781, 868; and Dr. Dolan's

consultative examination diagnosis of PTSD, R. 515, and found that Plaintiff's "statements about

the intensity, persistence, and limiting effects of her symptoms [were] inconsistent based on the

overall medical evidence and her acknowledged activities of daily living." R. 22.  These

statements were found in Plaintiff's Function Report, R. 341-42, and the ALJ noted that Plaintiff

asserted that she was the primary caretaker of her two minor children who have special needs,

her dog, and her cats; and that she reported driving, cooking daily, maintaining her grooming and

hygiene independently despite pain, and socializing with friends and family regularly. R. 22-23.

  The ALJ next opined that "[a]lthough hospital visitation notes show consistent

complaints of low back pain radiating to the lower extremities, left leg weakness, hip pain, left

knee pain, antalgic gait, left knee positive McMurray's [test] and decreased range of motion of

the hip and left knee, physical examinations show sensation intact to bilateral upper and lower

extremities, strength at 5/5 in the upper extremities bilaterally, full strength in the lower

extremities bilaterally, no instability of the left knee, good arc of motion, neurological intact, and

no tension signs." R. 23 (citing R. 463, 465, 468, 483, 488, 505-10, 532, 585, 783-84, 1094).

Additionally, the ALJ noted that plaintiff received multiple steroid injections in her lumbar spine

and right hip for pain; however, her treating physician, Dr. Jacob Handszer, M.D., "suggested

conservative treatment, and advised the claimant to stop getting injections for back and hip

pain," R. 827, and another treating physician, Dr. Stuart T. Styles, M.D., recommended that

Plaintiff's ACL injury be treated with a brace to manage her antalgic gait and that no surgical intervention was necessary, *see* R. 1089. R. 23.  In regard to Plaintiff's psychiatric treatment, the ALJ noted that Plaintiff reportedly stopped counseling treatment and stopped taking prescription medication for depression in 2013. R. 23 (citing R. 512).

The ALJ also discussed the opinion evidence in the record and assigned weights to the opinions of Dr. Figueroa, Dr. Stacy Gross, M.D., Dr. Suzanne Brown, D.O., Dr. Dolan, and Dr. M. Marks. R. 23-24.  The ALJ accorded great weight to Dr. Figueroa's opinion that Plaintiff had moderate limitations with prolonged walking, standing, bending, lifting, and carrying because the examination was detailed and generally consistent with the overall medical record. R. 23 (citing R. 533).

The ALJ assigned little weight to Dr. Gross's opinion that Plaintiff could occasionally lift/carry 15 pounds, stand/walk two hours per day, sit less than six hours, and push/pull not more than 15 pounds, as Dr. Gross opined that the duration for these limitations was three months. R. 23 (citing R. 493, 497).

The ALJ gave Dr. Brown's medical source statement no weight as she did not provide an opinion in the statement. R. 23 (citing 1061-64).

The ALJ assigned great weight to the portion of Dr. Dolan's opinion that Plaintiff had moderate limitations maintaining attention, concentration, and a regular schedule; relating adequately with others; and appropriately dealing with stress.  However, the ALJ gave little weight to the portion of Dr. Dolan's opinion that Plaintiff's psychiatric symptoms did not appear to be significant enough to interfere with her ability to function on a daily basis as her opinion "[was] internally inconsistent with the rest of the medical source statement relating to the claimant's moderate limitations." R. 23-24 (citing R. 515).  Finally, the ALJ "considered but

gave little probative weight" to Dr. Marks' RFC opinion reflecting overall mild limitations as Dr. Marks was a non-examining State agency consultant, was unable to review the most recent evidence of record, and "the opinion [was] inconsistent with Dr. Dolan's opinion providing moderate limitations." R. 24.

At step four, the ALJ considered whether the claimant would be able to perform any past relevant work and concluded that she could not. R. 24.

At step five, the ALJ concluded that "[b]ased on the testimony of the vocational expert, . . . considering the claimant's age, education, work experience, and [RFC], the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." R. 25-26.

Following these conclusions, the ALJ reached the end of the five-step process, determined that Plaintiff was not disabled, and denied her application for benefits. R. 26.

## IV.    LEGAL STANDARD

### A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (*per curiam*).

11

The substantial evidence standard is "even more" deferential than the 'clearly erroneous' standard. *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). "Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

**B.     Statutory Disability**

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). In addition, a person is eligible for disability benefits under the SSA only if:

> his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience, engage
> in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the
immediate area in which he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if he applied for work.
*Id.* § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step
sequential analysis:

1.    The Commissioner considers whether the claimant is currently
      engaged in substantial gainful activity.

2.    If not, the Commissioner considers whether the claimant has a
      "severe impairment" which limits his or her mental or physical
      ability to do basic work activities.

3.    If the claimant has a "severe impairment," the Commissioner must
      ask whether, based solely on medical evidence, claimant has an
      impairment listed in Appendix 1 of the regulations.  If the claimant
      has one of these enumerated impairments, the Commissioner will
      automatically consider him disabled, without considering vocational
      factors such as age, education, and work experience.

4.    If the impairment is not "listed" in the regulations, the
      Commissioner then asks whether, despite the claimant's severe
      impairment, he or she has residual functional capacity to perform
      his or her past work.

5.    If the claimant is unable to perform his or her past work, the
      Commissioner then determines whether there is other work which
      the claimant could perform.

*Rolon v. Commissioner of Soc. Sec.*, 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); *see* 20 C.F.R. §§

404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the burden of proof as to the

first four steps of the process. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

If the claimant proves that his impairment prevents him from performing his past work, the

burden shifts to the Commissioner at the fifth and final step. *See id.*  At the fifth step, the

Commissioner must prove that the claimant can obtain substantial gainful employment in the

national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. §

404.1560(c)(2).

13

## V.    ASSESSING THE ALJ'S FINDINGS

Plaintiff appears to challenge the ALJ's determination on two grounds: (1) the ALJ failed to fulfill his duty to develop the medical record, and (2) substantial evidence does not support the ALJ's conclusions (a) at step three and (b) as to Plaintiff's residual functional capacity.  For the reasons discussed below, I find that the ALJ did not fail to fulfill his duty to develop the record, and his decision at step three and his RFC analysis were supported by substantial evidence.

### A.  Duty to Develop the Medical Record

Plaintiff argues that the ALJ failed to fulfill his duty to develop the record in that he "failed to fully inquire of the treating and examining doctors as to whether, in light of what they know of the Plaintiff, and her impairment-associated limitations, strengths and vulnerabilities, and the progress of her illnesses, if significant variations in signs and functioning had been observed or could be expected." Dkt. 19 at 8.  Plaintiff provides one example of this alleged failure: that although the ALJ noted x-ray findings indicating a partial tear of Plaintiff's ACL with medium sized joint effusion and borderline Coxa Valga hip deformity, "the ALJ did not inquire regarding the effect upon ambulation and other work related functions of these impairments." *Id.*  As a result, Plaintiff contends, the ALJ's conclusion at step three that Plaintiff did not meet or equal Listing 1.02 was incorrect. *Id.* at 8-9.  Defendant argues that there are no obvious gaps in the medical record, and Plaintiff has failed to demonstrate otherwise. Dkt. 24 at 23.  I agree.

 It is well-settled that the ALJ has an affirmative obligation to develop the record. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).  "Whether the ALJ has fulfilled his or her duty to develop the record is a threshold issue." *Matos v. Berryhill*, No. 13 Civ. 5062, 2017 WL 2371395, at *15 (S.D.N.Y. May 4, 2017) (Report & Recommendation), *adopted* 2017 WL

2364368 (May 30, 2017).  "The ALJ must seek additional evidence or clarification where the documentation from a claimant's treating physician, psychologist, or other medical source is inadequate . . . to determine whether the claimant is disabled." *Matta v. Colvin*, No. 13 Civ. 5290, 2016 WL 524652, at *9 (S.D.N.Y. Feb. 8, 2016) (quotation marks and citation omitted). "To be sure, the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (citation omitted).

As discussed *supra*, in determining that Plaintiff's impairments did not meet Listing 1.02 (Major Joint Dysfunction), the ALJ reviewed a 2016 x-ray of Plaintiff's left hip showing borderline coxa valga/hip deformity with mild joint space loss but no displaced fracture or dislocation, R. 842; an October 2016 MRI of Plaintiff's left knee showing a partial tear or sprain of the ACL with medium sized joint effusion, R. 1097; physical examination notes from Dr. Gabriel Brown, dated June 25, 2015, R. 488-89; and Plaintiff's function report, R. 341-60.  The ALJ reasoned that although physical exams had shown an antalgic gait, Plaintiff had 5/5 strength in the lower extremities and was able to ambulate and drive. R. 19 (citing R. 488-89, 341-60).

As noted, Plaintiff only argues that the ALJ failed to inquire of the treating and examining physicians as to how these findings affect Plaintiff's ambulation and other work-related functions but does not suggest which treating sources the ALJ should have recontacted, what may have been found on such an inquiry, and what, if any, evidence contradicts the evidence cited by the ALJ demonstrating that Plaintiff can ambulate and perform work-related functions.

Listing 1.02 defines disability caused by a major dysfunction of a joint(s) as:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 1.02.

The regulation defines "[i]nability to ambulate effectively" as:

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at App. 1 § 1.00B2b.

Following a plenary review of the medical record, in addition to the evidence cited by the ALJ in reaching his conclusion, *supra*, I find that there was no obvious gap in the record. For example, on June 23, 2015, Plaintiff was found to have painless range of motion in the hips, R. 486, and on June 25, 2015, an x-ray of her right hip was normal, R. 489. And although, in her July 2015 function report, Plaintiff asserted that she was unable to walk anywhere without "horrible pain, my feet swell, I get pain in both right and left hips, so I don't walk;" that she was

16

unable to stand more than a few minutes because of her hip pain, R. 346; that she was unable to climb stairs without the use of a handrail, *id.*; and that before stopping to rest, she could walk a "couple of feet 2-3 min?" as it was "to [sic] painful and I normally will turn around because the pain is in my legs," R. 347; she also asserted that she did not use any assistive devices, R. 347, she could drive, R. 344, and she was capable of shopping in stores and making trips to the Post Office, supermarket, and to doctor appointments for herself and her daughters, R. 344-45. Additionally, on July 23, 2015, Plaintiff's treating physician, Dr. Gross, provided in a medical source statement that Plaintiff could lift and carry occasionally (up to 1/3 of a work day), stand and/or walk without limitation for up to two hours per day, and sit without limitation for less than six hours per day. R. 493-98.  Notably, Dr. Gross also opined that the expected duration of Plaintiff's condition was only three months. *Id.*

On August 18, 2015, an examination by Dr. Syed found that Plaintiff was experiencing significant back and hip pain, but she had no pain radiating down her leg and was able to walk slowly, favoring her left side.  Dr. Syed further assessed that Plaintiff's imaging showed normal alignment with no evidence of compressive pathology. R. 502-03.

On September 9, 2015,  Dr. Figueroa completed a consultative exam of Plaintiff and observed that Plaintiff's gait was limping, she could not walk on her heels or toes, she had a full squat, she used no assistive devices, she needed help changing for the exam and getting on and off the table, she was able to rise from a chair without difficulty, and she had full range of motion in her hips bilaterally on flexion/extension and internal rotation but limited range of motion bilaterally on external rotation, backward extension, abduction, and adduction. R. 531-32.  Additionally, Plaintiff's strength in her upper and lower extremities was 5/5. R. 532.

Plaintiff attended six physical therapy sessions between September 11, 2015 and October 13, 2015 and, throughout, it was noted that Plaintiff could ambulate independently with increased pain and climb stairs independently using no assistive device but "with railing with difficulty." R. 748.  On November 16, 2015, Plaintiff was discharged apparently because she failed to return after her October 13th appointment. R. 747.

A February 2016 x-ray of Plaintiff's left knee showed possible slight patellar tilt but no effusion, R. 831, and an MRI of the same knee two days later was found to be normal, R. 829.

On May 6, 2016, Dr. Suzanne Brown opined that despite pain on motor testing, Plaintiff's strength throughout was 5/5 and her gait was normal, R. 823, and on June 16, 2016, Dr. Syed noted that Plaintiff had full strength in her lower extremities, R. 812.

Plaintiff was involved in an automobile accident in July or August of 2016 and reported soreness and left hip pain and cracking, but, on August 6, 2016, Dr. Suzanne Brown conducted a physical exam, and while she assessed Plaintiff with bilateral hip pain and knee pain, she also reported that Plaintiff's motor strength was 5/5 throughout. R. 805-07.  On August 31, 2016, Plaintiff visited Dr. Brown again seeking treatment for headaches, and Dr. Brown noted 3/5 strength, at most, in her lower extremities and an antalgic gait. R. 1082-85.  On September 26, 2016, Dr. Styles noted that although Plaintiff had a positive medial McMurray's test, she had no instability in her left knee and good arc of motion. R. 1094.  An October 2, 2016 MRI of Plaintiff's left hip revealed a labral tear but was otherwise unremarkable, R. 1096, and an October 3, 2016 MRI of her left knee revealed a partial tear or sprain of her ACL and medium sized joint effusion, R. 1097.

On January 30, 2017, Dr. Styles reviewed the two MRIs above but noted that Plaintiff had no gross instability. R. 1092.  Dr. Styles recommended a cortisone shot for her hip and a

18

brace and physical therapy for her knee; he did not recommend surgery for Plaintiff's knee. *Id.*
On April 4, 2017, Dr. Styles still did not recommend surgical intervention, instead urging the
continued use of a brace and visits to pain management and her spine specialists. R. 1089.

On June 6, 2017, Plaintiff saw Dr. Gabriel Brown for left hip pain, and Dr. Brown found
that Plaintiff had limited range of motion in her hip but radiographs of her left hip revealed no
significant pathology,  and he recommended a steroid injection. R. 794.  On August 7, 2017, Dr.
Brown found that Plaintiff had limited range of motion in her left knee but felt her knee was
stable. R. 795.

On August 31, 2017, Dr. Suzanne Brown assessed Plaintiff with diffuse paresthesia,
weakness, unsteady gait, and pain radiating down her legs. R. 788-91.

On September 26, 2017, Dr. Syed, upon physical examination, found that Plaintiff had
full strength in her lower extremities bilaterally. R. 783.

On May 28, 2018, Dr. Suzanne Brown completed a physical source statement and
diagnosed Plaintiff with back pain radiating down her legs, joint pains, and an unsteady gait. R.
1061.  As for Plaintiff's prognosis, Dr. Brown deferred to pain management, physical medicine
& rehabilitation ("PM&R"), and orthopedics. *Id.*  Dr. Brown's clinical findings consisted of
antalgic gait at last exam and inconsistent motor and sensory exams. *Id.*  Dr. Brown had
prescribed physical therapy in 2015 and had not prescribed Plaintiff medications since 2016. *Id.*
Dr. Brown declined to estimate Plaintiff's functional limitations in a competitive work
environment or describe any other limitations that would affect Plaintiff's ability to work at a
regular job on a sustained basis, instead deferring to PM&R, orthopedics, and psychiatry. R.
1062-64.

Although Plaintiff testified at the June 2018 hearing that she needed assistance shopping for food and doing laundry, R. 94-95, and was unable to bend over, R. 110, she also testified that despite experiencing pain, she could ambulate, R. 97-98, and did not use a cane, R. 110.

Plaintiff's conclusory allegation that the ALJ "failed to fully inquire of the treating and examining doctors" does not persuade this Court that an obvious gap existed in the record. Accordingly, based on a review of the medical record, I find that there are no obvious gaps in the record, and the ALJ was not required to affirmatively to seek out additional evidence. *Eusepi*, 595 F. App'x at 9.

### B. Substantial Evidence

#### 1. Substantial Evidence Supports the ALJ's Determination that Plaintiff's Impairments, or Combination of Impairments, do not Meet or Medically Equal a Listed Impairment.

Plaintiff contends that "[t]he ALJ did not refer in detail to the probative evidence in support of each of his assessments, as required, and did not otherwise show, through a detailed and reasoned evaluation and analysis, how specific probative medical evidence, supported his finding of a failure to meet or equal a listing." Dkt. 19 at 8.  However, Plaintiff does not specify which Listings analyzed by the ALJ were decided incorrectly or, beyond conclusory assertions, what errors were committed by the ALJ.  The only example that Plaintiff gives seemingly explaining the ALJ's error at step three was that "[t]he ALJ relied upon findings and assessments of the psychological consultative examiner without explaining how he factored into his decision the opinion of that examiner and that the results of his examination appear to be consistent with psychiatric problems which 'did not appear to be significant enough to interfere with the Plaintiff's ability to function on a daily basis' but the Plaintiff has been shown to be vocationally incapacitated constantly (that is, on a daily basis) and so limited by her combination of

impairments to not sustain full-time competitive employment." I interpret this as a claim by Plaintiff that substantial evidence did not support the ALJ's decision that Plaintiff's impairments did not meet, or equal, Listing 12.06. Dkt. 19 at 8.[2]

Listing 12.06 is met if the claimant can establish the existence of anxiety, panic, or obsessive-compulsive disorders *and* satisfy the requirements in either paragraph B *or* C:

B.  Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

   1.  Understand, remember, or apply information (see 12.00E1).

   2.  Interact with others (see 12.00E2).

   3.  Concentrate, persist, or maintain pace (see 12.00E3).

   4.  Adapt or manage oneself (see 12.00E4).

OR

C.  Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

   2.  Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

   2.  Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06.

---

[2] As discussed *supra*, Plaintiff also appears to contend that the ALJ's failure to develop the record caused him to err in his analysis of Plaintiff's disability under Listing 1.02, Dkt. 19 at 9; however, based on my discussion above in which I found that the record was fully developed on this point, I do not find, and Plaintiff has not articulated, any error in the ALJ's conclusion that Plaintiff's impairments do not meet or equal this listing.

As discussed above, the ALJ found that paragraph B criteria were not satisfied "[b]ecause the claimant's mental impairment does not cause at least two 'marked' limitations or one 'extreme' limitation," reasoning that the records showed that Plaintiff had moderate limitations in all four areas of mental functioning. R. 20-21.  The ALJ further concluded that the record failed to establish paragraph C criteria as Plaintiff had more than minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life, and that the record showed "stability of her condition, and the claimant's acknowledgement as primary caretaker for two (2) minor children with special needs." R. 21.

Plaintiff testified that she last took medication for her psychiatric impairments in 2013, R. 98, and does not appear to have received any treatment for her mental health in the relevant period.  In his consultative psychiatric examination, Dr. Dolan concluded, on September 9, 2015, that Plaintiff was able to follow and understand simple directions and perform simple tasks independently; had mild limitations maintaining attention and concentration and maintaining a regular schedule; was able to learn new tasks, perform complex tasks independently, and make appropriate decisions; and had moderate limitations relating adequately with others and appropriately dealing with stress. R. 515.  Dr. Dolan concluded that Plaintiff's psychiatric problems "[did not] appear to be significant enough to interfere with the claimant's ability to function on a daily basis." *Id.*  On September 24, 2015, state agency psychiatric consultant, Dr. M. Marks, found that Plaintiff had mild restrictions in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. R. 135, 147.  Dr. Marks concluded that Plaintiff was able to complete a normal workday without interruption and perform at a consistent pace. Id.

In support of his finding that Plaintiff had moderate limitations in understanding,

remembering, or applying information, R. 20, the ALJ also cited to Plaintiff's claims in her

function report that she could perform simple maintenance, prepare meals, pay bills, go to

doctor's appointments, take medications, shop, and drive, in addition to evidence that Plaintiff

was able to communicate information about her health, describe her work history, follow

instructions from healthcare providers, and comply with treatment. *See* R. 341-60, 512-16, 529-

33.  After noting that Plaintiff testified at her hearing that she had difficulty engaging in social

activities, the ALJ concluded that Plaintiff had moderate limitations in interacting with others, R.

20, due to her statements in her function report that she was able to get along with others, shop,

spend time with friends and family, deal appropriately with authority, and live with others, *see* R.

341-60, and medical records showing that Plaintiff was described as pleasant and cooperative

and that she had good interaction with non-medical staff, *see* R. 465, 513.  Next, the ALJ

concluded that Plaintiff had moderate limitations in her ability to concentrate, persist, or

maintain pace, R. 20, due to her statements that she could drive, prepare meals, watch TV,

manage funds, and handle her own medical care, *see* R. 341-60, 514, 529.  Finally, the ALJ

found that Plaintiff had moderate limitations in her ability to adapt or manage herself, R. 21, due

to her assertions that she could handle self-care and personal hygiene, care for pets, and care for

her children, *see* R. 341-60, and evidence in the medical record demonstrating that Plaintiff had

appropriate grooming and hygiene, no problem getting along with providers and staff, a normal

mood and affect, and no problems with temper control, *see* R. 482, 513.

Additionally, the ALJ found that the paragraph C criteria were not satisfied, R. 21, due to

the lack of evidence in the record in support of its requirements, evidence showing stability in

her condition, and Plaintiff's acknowledgments that she was the primary caretaker of two minor

children with special needs, *see* R. 341-60.

Plaintiff has again failed to cite any evidence in the record contradicting the ALJ's findings and, accordingly, after a plenary review of the records, I find that the ALJ's determination at step three was supported by substantial evidence.

### 2.  Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff appears to argue that the ALJ's RFC analysis did not comply with SSR 96-8p in that the ALJ (1) failed to "provide, pursuant to *Social Security Regulation 20 CFR* [§] *404.1527(d)*, a detailed and reasoned rationale spelling out the reasons for the weight assigned to each treating and examining report[;]" (2) "failed to show rational support for his finding of a capacity to perform work at any exertional level," Dkt. 19 at 7-8; (3) "failed to provide the required detailed analysis utilizing all the criteria in *Social Security Regulation 20 CFR* [§] *404.1529* with respect to all of Plaintiff's symptomology[;]" and (4) other assertions that appear to amount to a contention that the ALJ failed to adequately consider the full record, including Plaintiff's reported activities of daily living, *id.* at 9.

As outlined above, the ALJ ultimately found that Plaintiff had the RFC "to perform sedentary work . . . except the claimant can climb, balance, bend, stoop, kneel, crouch, and crawl on an occasional basis.  She can work at low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks, involving only simple work-related decisions; with few, if any, workplace changes; and where there is only occasional interaction with supervisors, coworkers, and/or the general public." R. 21.

First, as discussed *supra*, the ALJ discussed the opinion evidence in the record, assigned weights to the opinions of the treating and consultative physicians in the record, and provided his reasoning for doing so.  Plaintiff has pointed to no internal inconsistencies in the opinions of the treating sources, no inconsistencies between their opinions and the medical evidence, or to any

specific objections to the ALJ's apportionment of weight. Accordingly, there is no indication in the record, or in Plaintiff's brief, that the ALJ failed to comply with 20 CFR § 404.1527(d).

Second, as noted, the ALJ discussed in some detail his rationale for his RFC analysis and conclusion that Plaintiff could perform sedentary work with the limitations set forth above. Plaintiff's conclusory assertion that the ALJ did not do so is insufficient to establish that his decision was not supported by substantial evidence.

Third, as discussed, after the ALJ determined that Plaintiff's underlying medically determinable impairments could reasonably be expected to cause her alleged symptoms, the ALJ concluded that the alleged symptoms were not entirely consistent with the medical evidence and other evidence in the record. R. 22.  Although the ALJ set forth in detail his reasoning for his conclusion, citing to specific portions of the medical record, R. 22-23, Plaintiff points to no single specific objection to the ALJ's findings.  Accordingly, based on a review of the record, Plaintiff's conclusory assertion does not persuade this Court that the ALJ violated 20 CFR § 404.1529 in reaching his decision related to Plaintiff's symptomology.

Accordingly, based on the discussion above and after a review of the full record, including Plaintiff's reported activities of daily living, I find that the ALJ's RFC analysis was supported by substantial evidence.

**VI.    CONCLUSION**

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is **DENIED**, and Defendant's motion for judgment on the pleadings is **GRANTED**.


The Clerk of the Court is respectfully requested to terminate the pending motions (Dkts. 18, 23) and close this case.

Dated:  June 4, 2020
        White Plains, New York

                        Respectfully submitted,


                        **Paul E. Davison, U.S.M.J.**